706 So.2d 887 (1998)
LOVE PGI PARTNERS, LP, and Sugarmill Woods, Inc., Appellant/Cross-Appellees,
v.
Ronald SCHULTZ, et al., Appellees/Cross-Appellants.
No. 96-1973.
District Court of Appeal of Florida, Fifth District.
February 6, 1998.
Rehearing Denied March 18, 1998.
*889 Enola T. Brown, Robert L. Rocke, and Christopher L. Griffin of Annis, Mitchell, Cockey, Edwards & Roehn, P.A., Tampa, for Appellant/Cross-Appellee.
Clark A. Stillwell of Brannen, Stillwell & Perrin, P.A., Inverness, for Appellee/Cross-Appellant.
W. SHARP, Judge.
Love PGI Partners, LP, (Love) and Sugarmill Woods, Inc. (Sugarmill) appeal from final judgments[1] rendered against them concerning the property appraiser's (Schultz) denial (in part) of their claims for agricultural classification for lands located in Citrus County for 1994. The issues on appeal are whether the trial court had substantial competent evidence presented to it to determine that Love's and Sugarmill's use of part of their lands for forestry by natural regeneration was not bona fide and whether the trial court correctly ruled that cattle-grazing operations conducted on part of Sugarmill's property could not qualify for an agricultural classification because it was illegal under the Citrus County Comprehensive Plan and Development Code.
Schultz cross-appeals the trial court's rejection of his argument that an agricultural classification for Sugarmill's property used for cattle grazing should additionally be denied because Sugarmill's predecessor in title platted all of the land (as well as Love's) as part of a planned unit development, including single family residential, multi-family residential, recreation areas, commercial areas, and streets. The plats were recorded in 1973, although none of the property under consideration in these cases had been developed. We affirm as to Love, reverse as to Sugarmill, and affirm the cross-appeal.
Punta Gorda Developers, Inc. and Norcorp, Inc., predecessors in title, platted the property involved in this case as part of a larger planned unit development known as Sugarmill Woods, in 1973. It consists of four separate villages, two of which had been constructed at the time of this litigation. However, with regard to the properties at issue in this case, there was no development whatsoever. The current owners testified there would probably be no development for the foreseeable future.
Sugarmill acquired the land involved in this lawsuit from Punta Gorda in the mid 1980s. It is located both north and south of County Road 480, and had been classified agricultural through 1991. It currently consists of 4,300 acres Sugarmill claims is and has been used for cattle grazing, and 1,000 acres used for forestry. In 1992 or 1993, Love acquired its parcel of approximately 343.9 acres from Sugarmill. It is located south of County Road 480. From 1974 through 1991, it also was classified agricultural.
In 1992, Schultz denied agricultural classification for all of the property except areas in planted pines and improved pasture. No agricultural classifications were sought in 1993. In 1994, Sugarmill and Love sought an agricultural classification for all of the land, based on forestry and cattle-grazing operations.
Sugarmill claimed all of its land lying north of the County Road 480 had been bona fide used for cattle grazing. And, it claimed that all of its land south of County Road 480 was used for forestry operations, some in natural regeneration and some in planted *890 pines. Schultz granted agricultural classification for 733.57 acres in planted pines (south of County Road 480), and 160 acres in an improved pasture (north of County Road 480) only, and denied agricultural classification for the balance. Sugarmill appealed the denials. The trial court upheld these determinations. With regard to Love, Schultz granted agricultural classification for the area in planted pines and denied it for the natural woodland area. Love appealed the denial. The trial court upheld that determination.
The appellants in this case had the burden of proof at trial to show either no reasonable hypothesis supported the property appraiser's determination, or the appraiser did not consider the appropriate statutory factors under § 193.461. See Davis v. St. Joe Paper Co., 652 So.2d 907, 908 (Fla. 1st DCA 1995); "`Just Value' or Just a ValueFlorida's Imperial Property Appraiser," 48 Fla. L.Rev. 723, 737 (Sept.1997). The findings of the trial court as to disputed facts cannot be overturned by this court.[2]

I. Natural Woodlands or Natural Regeneration.
The issue concerning whether Love's parcel adjacent to its planted pines was used for a bona fide forestry use is determinative of its appeal, since it did not present an argument below that the parcel was used for cattle grazing. With regard to Sugarmill, it sought an agricultural classification for all of its land lying south of County Road 480, which included a portion in planted pines as well as some in natural woodlands. Although the final judgment rendered against Sugarmill does not contain an express finding that Sugarmill's agricultural use for the natural woodlands was not bona fide, the evidence presented for both parties was identical and the trial court upheld denial of an agricultural classification for that area. The result is and should be the same for both parties.
The testimony offered by Schultz concerning the use of the natural woodlands was comprehensive and conclusive. Reggie Tetter, a senior appraiser with the Department of Revenue in Tallahassee, reviewed the forestry operations on both parcels. His testimony indicated that, based on aerial photographs from 1960 and historical records, the land had not changed much since 1960. It is composed of candler soil, a type not highly productive for forestry operations. In the early part of the century, it appears to have been used for naval stores, and prior to the 1940s, all of the long leaf pines were harvested. At present there are open areas, turkey oak and jack oak (neither is commercial timber), and scattered long-leaf pine with a few seedlings. However, there are very few large long-leaf pines on the parcels, which produce seed.
In his opinion, there was not enough long-leaf pine present to produce a marketable stand of trees in the foreseeable future. It would take another fifty years by natural regeneration, to produce an adequate stock of timber. He also opined that it would be necessary to aggressively manage the land by scarification of the soil, controlled burning, and planting with long-leaf pine or sand pine. He said there was no evidence of such activity on this land as of January 1, 1994 (the critical date for this appeal).[3] He noted the presence of cattle in the past on this land and pointed out that running cattle can negatively impact forestry operations.
He agreed that it is possible to have a bona fide natural regeneration forestry operation, which would be entitled to an agricultural classification but concluded this was not happening on the parcels in question. There had been no harvesting of trees on these lands, no re-forestry management plan submitted for them, and there were no commercially-viable stands of trees on the property.
James Sander, a former employee of Punta Gorda Development Co., the prior owner of the lands from 1971 to 1991, testified that other than the areas put into planted pines, there had been no forestry plan for the natural woodlands. It consisted largely of jack oak, a few scattered pines, and palmettos. They did controlled burns of the area to *891 improve grazing for cattle. Since 1974, various cattle lessees had run cattle on the natural woodland.
Andrew Love, chair of the general partner of Love PGI, testified he was familiar with the properties before they were sold to the predecessor, Punta Gorda Isles, and up to the present. He testified that as of January 1994, he did not think there was any specific forestry management plan for the Love property, other than the area in planted pines. They did controlled burns and maintained fire lanes in the natural woodlands, which he said would benefit the timber operations. However, he admitted these activities were largely to enhance cattle-grazing operations.
Gerald Evans testified for Love. He is a staff forester with the Natural Resource Planning Services, a private consulting service, who had been retained by Love to handle timber sales for 1994, and to develop goals for managing the land. He admitted that most of his activities on the land occurred in mid-1994.
Evans was developing ideas and guidelines for the natural woodlands on the Love property. He determined there was not sufficient merchantable timber in the natural area, and he recommended that the trees be left alone to get regeneration established. He thought there was a sufficient seed source that could be used to regenerate the area. He was in the process of developing a forestry plan for this part of the property, which would include controlled burns, and fire lanes.
The Florida Constitution provides that agricultural land may be classified by general law for ad valorem tax purposes, and assessed solely on the basis of character or use.[4] Section 193.461 implements that provision of the Constitution. It provides that property appraisers shall classify all lands on an annual basis within the county as agricultural or nonagricultural. Regarding the process of classification section (3)(b) states:
[O]nly lands which are used primarily for bona fide agricultural purposes shall be classified as agricultural. `Bona fide agricultural purposes' means good faith commercial agricultural use of the land. In determining whether the use of the land for agricultural purposes is bona fide, the following factors may be taken into consideration:
1. The length of time the land has been so utilized;
2. Whether the use has been continuous;
3. The purchase price paid;
4. Size, as it relates to specific agricultural use;
5. Whether an indicated effort has been made to care sufficiently and adequately for the land in accordance with accepted commercial agricultural practices, including, without limitation, fertilizing, liming, tilling, mowing, reforesting, and other accepted agricultural practices;
6. Whether such land is under lease and, if so, the effective length, terms and conditions of the lease; and
7. Such other factors as may from time to time become apparent.
Florida cases which address these provisions stress the key to determining entitlement to agricultural classification is the actual physical activity being conducted on the land. Bass v. Gen. Dev. Corp., 374 So.2d 479 (Fla.1979); McKinney v. Hunt, 251 So.2d 6 (Fla. 1st DCA 1971); Davis v. St. Joe Paper Co.; Schooley v. Wetstone, 258 So.2d 483 (Fla. 2d DCA 1972); Hausman v. Rudkin, 268 So.2d 407 (Fla. 4th DCA 1972). If the land is being used for bona fide agricultural purposes, it is entitled to the agricultural classification. Straughn v. Tuck, 354 So.2d 368 (Fla.1977). This is generally a fact determination, appropriate for the trial court to make. An appellate court must affirm, if there is sufficient competent evidence to support the trial court's ruling. Hausman v. Rudkin; Conrad v. J.M. Sapp, 252 So.2d 225 (Fla.1971); Greenwood v. Oates, 251 So.2d 665 (Fla.1971).
Appellants argue that the denial of an agricultural classification in this case was based on testimony that the natural regeneration forestry operation on these lands was not, nor could it be, commercially viable for a *892 very long time. We agree that commercial viability of an agricultural use or activity is not determinative.[5] But profit motive may be a factor which can be considered under section 193.461(3)(b)7. See Straughn v. Tuck, 354 So.2d at 370 (the term "commercial agricultural use" simply adds another factorprofit or profit motivewhich may be considered by the tax assessor, but it does not limit the classification to profitable operations).
However, we think this case is similar to Greenwood v. Oates. In that case, the court upheld the denial of agricultural classification for a large acreage parcel of woodlands. As in this case, the trial court heard testimony about a number of factors, the opinion of forestry experts as to whether forestry operations were being conducted on the lands, the nature of the terrain, the density of marketable timber, the past usage of the land, and the reasonable attainment of a salable product within a reasonable future time, keeping in mind that trees do not mature as quickly as "chickens and cows."
We think the trial court's denial of an agricultural classification for the natural woodlands should be affirmed, based on the evidence adduced at trial. The tracts had few stands of merchantable timber, the viability of a natural regeneration plan was in dispute, few improvements had been made for forestry purposes, and there was no forestry management program in effect or even developed for the land on the critical date of January 1, 1994. There simply was insufficient evidence of any actual forestry operations on the lands in question on that date.

II. Sugarmill: Cattle grazing, a bona fide agricultural use?
Sugarmill's 4,300 acres lying north of County Road 480 was denied an agricultural classification for cattle grazing. As stated above, Schultz did allow an agricultural classification for 160 acres also north of County Road 480, which Sugarmill used for improved pasture. That area is not in dispute. With regard to the balance of the parcel, the testimony at trial concerning Sugarmill's use of it for livestock operations was essentially undisputed.
This land had been leased and used for cattle grazing since the 1970s. However, there was a two-year gap, from 1991 to 1993, when cattle operations ceased. This finding was disputed by Sugarmill, but sufficient evidence was adduced to establish that fact.
In 1993 the land was leased to Jessie Thomas. He testified he patched the fence all along County Road 480, and along the Sugarmill development. He fenced in the entire area and grazed cattle on that parcel. He also burned areas to produce better feed for the cattle and consulted the county forester concerning the burns.
The basis for Schultz' and the trial court's denial of an agricultural classification for this parcel in 1994 was because the land is zoned PR-D (Planned DevelopmentResidential). Pursuant to the Citrus County Land Development Code, adopted pursuant to chapter 163 in 1990, cattle grazing is not a permitted use or a legal nonconforming use for that category of zoning. The Code would have permitted a nonconforming use to continue, if it had not been discontinued for a period of 180 consecutive days. The trial court concluded that in order to conduct cattle grazing activities on this parcel, Sugarmill would have to have that activity properly exempted and permitted by the County, which it had not done.
We disagree. The appropriateness of agricultural classification of land for ad valorem tax purposes depends on the general statutory laws of this state, not a county code. As noted above, section 193.461(3)(b) makes this determination turn primarily on the actual, good faith use of the land. If the land is being used for a bona fide agricultural purpose, it is entitled to the agricultural classification. Hausman v. Rudkin. Zoning may be a consideration under the catchall "other factors" provision in section 193.461(3)(b)7, but it is not determinative. Wilkinson v. Kirby, 654 So.2d 194 (Fla. 2d *893 DCA 1995). Nor does section 193.461(4)(a)3 appear applicable because Sugarmill or its predecessor in title did not seek rezoning of the land from an agricultural use to a non-agricultural use. Compare Harbor Ventures, Inc. v. Hutches, 366 So.2d 1173 (Fla.1979). At the time of the rezoning to a PUD in 1973, there was no impediment to continued agricultural use of the property under the zoning laws then in effect. In any event, zoning is at best only a rebuttable presumption. Lackey v. Little England, Inc., 461 So.2d 281 (Fla. 5th DCA 1985).
Schultz argues that Robbins v. Yusem, 559 So.2d 1185 (Fla. 3d DCA 1990) is determinative. In that case, the Third District held that land classified under the Dade County Code as IC-C but used to farm yucca and calabaza, could not receive an agricultural classification because agriculture was an illegal use for that property, under the zoning code. The court concluded that a finding that commercial agricultural use is not bona fide because prohibited under the zoning laws, may be overcome by showing the use is a legal, nonconforming use. But, as in this case, that showing was not possible. Thus, as a matter of law, the court concluded agricultural use could not be considered bona fide because of the land's zoning.
We disagree with Robbins, to the extent that it holds agricultural classification for ad valorem tax purposes is controlled by a county code adopted pursuant to chapter 163. Both chapter 163.3164(4) and the Citrus County Code, adopted pursuant to chapter 163[6] deal with regulations for the development of land. They provide for regulation of activities which constitute "development."[7] Both the statute and the county code define "development" by reference to section 380.04, which provides:
(1) The term development means the carrying out of any building activity or mining operation, ...
* * * * * *
(3) The following operations or uses shall not be taken for the purpose of this chapter to involve `development' as defined in this section ...

(e) The use of any land for the purpose of growing plants, crops, trees, and other agricultural or forestry products; raising live stock; or for other agricultural purposes. (emphasis supplied).
It appears forestry and cattle raising activities are excluded from regulation of development pursuant to the statute and the Code. Further, section 163.3194(5) expressly states:
The tax exempt status of lands classified as agricultural under s. 193.461 shall not be affected by any comprehensive plan adopted under this act as long as the land meets the criteria set forth in s. 193.46.
From both of these statutory provisions it appears that the Legislature did not intend that lands classified as agricultural under chapter 193 for ad valorem tax purposes, would be affected by the adoption of comprehensive development plans pursuant to chapter 163. No Code adopted pursuant to chapter 163 can alter its intended impact.[8] Comprehensive plans adopted pursuant to chapter 163 are intended to regulate and control "development," as defined by the statute and the Code. They are intended to have no impact on classification of lands as agricultural for ad valorem tax purposes, pursuant to section 193.3194(5).
As demonstrated above, both the trial court and the taxing authority, Schultz, used an incorrect legal basis to deny Sugarmill agricultural classification on its lands used for cattle grazing. Thus their determinations are not entitled to the presumption of correctness or the necessity to show that no reasonable hypothesis supported the property appraiser's determination. Davis v. St. Joe Paper Co.; Wilkinson v. Kirby, 654 So.2d 194 (Fla. 2d DCA 1995); The Glades, Inc. v. Colding, 422 So.2d 349 (Fla. 2d DCA 1982).
*894 If this record contained any disputed material facts concerning whether Sugarmill or its lessee was using these lands for a bona fide cattle grazing operation on January 1, 1994, we would remand this cause to the trial court for a factual determination of this issue using the factors test set forth in section 193.461(3)(b). Atlantic Richfield Co. v. Walden, 277 So.2d 815 (Fla. 2d DCA 1973).[9] However, Schultz in this case presented no evidence to counter or dispute Sugarmill's witnesses that, in fact, as of January 1, 1994, Jessie Thomas was conducting a cattle-grazing operation on the disputed property. He fenced the land completely, repaired and restored some fencing, improved the feed through controlled burns and ran cattle on the land. Thus there is no basis to conclude that this was a non-existent, or sham (not a bona fide) livestock activity. Hausman v. Rudkin. These lands were entitled to an agricultural classification for 1994.

III. Cross-appeal: Effect of platting and deed restrictions.
Schultz argues on cross-appeal that an agricultural classification for all of Sugarmill's property (except for the planted pine area and the improved pasture), should also be denied because in 1973 the predecessor in title to all of the properties involved in this case platted the entire Sugarmill Woods residential/mixed use development project, consisting of 15,400 acres, and recorded the plat in the public records of Citrus County, Florida. The plat shows mixed uses for the land: single family lots, multi-family projects, recreational areas, commercial sites, and streets. By January 1994, Cypress Village and Oak Village had been constructed. However, none of the land involved in this case (Pinewood and Palm Villages) had been developed. No streets or other improvements had been made, and no lots had been sold. The undeveloped parcel was sold to Sugarmill, and in turn, it sold a smaller parcel to Love.
Schultz relies on language in the plat which purports to dedicate the streets and park areas to the public. He took the position that Sugarmill has no right to use the platted public areas for cattle grazing, without formal approval from Citrus County, since the dedication language of the plat was unqualified. Section 177.081(2) provides:
When a tract or parcel of land has been subdivided and a plat thereof bearing the dedication executed by the developers and mortgagees having record interest in the lands subdivided and the approval of the governing body has been secured and recorded in compliance with this chapter, all streets, alleys, easements, right-of-way, and public areas shown on such plat, unless otherwise stated, shall be deemed to have been dedicated to the public for the uses and purposes thereon stated.
§ 177.081(2), Fla. Stat. (1995).
Both parties conceded that it would be economically impossible for Sugarmill to fence off the public areas shown on the plat so as to restrict the cattle grazing to simply the platted lot areas. Schultz argues that unless Sugarmill replats the property and qualifies the dedication of the roads and public area to the public, or obtains approval from the county for use of the dedicated property for commercial agricultural use, its agricultural classification must be denied because it is not "bona fide." However, this argument is inconsistent with Schultz' granting an agricultural classification for the improved pasture area and the planted pines, although they too are part of the platted, undeveloped villages. Additionally, since 1973 the whole of the platted areas has been taxed by Citrus County, with no exception for the claimed public streets and park areas.
At trial, it was shown that other than Sugarmill and Love, there are no other owners of the platted property. No streets or other improvements have been built. Agents for the owners testified that no development of this property was contemplated for a long period of time. They intended to use the *895 land as it always had beenfor forestry and cattle grazing.
Sugarmill argued that until the roads have been constructed and accepted by the county for maintenance, it has the right to use the whole of the parcel for agricultural purposes. See Daniel v. State Turnpike Authority, 213 So.2d 585, 587 (Fla.1968); Dept. of Commerce v. Matthews Corp., 358 So.2d 256, 260 (Fla. 1st DCA 1978). It also pointed to language added to the Improvement Agreements between Citrus County and Sugarmill's predecessor in title in 1981. They provide:
The County has accepted the plat for all Villages as recorded in Plat Book 9 Pages 86-150, inclusive, ... and shall accept the area depicted on said plat as dedicated for public use, including, but not limited to streets, at such time as said improvements are satisfactorily completed.... Nothing in the agreement shall be construed as meaning that the County agrees to accept the streets or other improvements for maintenance by the County unless said streets or said improvements are agreed to be accepted for maintenance by formal resolution doing so and describing therein the streets and improvements accepted for maintenance. (emphasis supplied)
Sugarmill presented testimony of witnesses involved in the original platting who stated that the public areas of the plats were not intended to be dedicated and accepted by the county until the improvements required to be made on the plats were completed, village by village. This is consistent with the manner in which Citrus County has handled this project in the past. Further, this interpretation is compatible with the lack of public dedication of the park areas on the plats, for it would be anomalous to have the streets dedicated and accepted at a time prior to the dedication and acceptance of the parks.
This situation is distinguishable from those cases in which third parties purchased lots in a platted subdivision which shows streets and parks. Those parties might have enforceable rights to use the platted streets and parks.[10] However, in this case, there are no third-party lot owners. Love and Sugarmill purchased their large parcels in fee from the platter-predecessor in title. Only they would have standing to complain about enforcing rights to platted streets and parks, and they are not complaining.
We agree with the trial court that the deed restrictions, platting and dedication of streets and parks in the undeveloped villages should have no impact on, and play no part in, denying agricultural classification for lands used for agricultural purposes. Other cases involving platted but undeveloped lands have held that agricultural classification should not be denied for other reasons. In Harbor Ventures, Inc. v. Hutches, the court held that section 193.461(4)(a) did not apply to deny agricultural classification to property rezoned from a non-agricultural use to another non-agricultural use. However, as in this case, the land was rezoned to a PUD. That circumstance was not used to deny the agricultural classification. In The Glades, Inc. v. Colding, part of the property involved was platted as a subdivision. However, it had been used as a nursery area for plants. The court ruled there was no reason to deny it agricultural classification. The court specifically rejected the owner's intended future use of the land (subdivision development) and the high purchase price as determinative factors, regarding denial of an agricultural classification. The fact that the land was platted and undeveloped was also an additional factor insufficient to deny it the classification.[11]
The acceptance of Schultz' argument on this point also appears to be inconsistent with Bass v. General Dev. Corp. In Bass, the supreme court held that section 193.461(4)(a)4, Florida Statutes (1975) was unconstitutional because it created an irrebuttable presumption that lands for which an owner had recorded a plat were not entitled to an agricultural classification. The court said that agricultural use is the only proper test for classifying land agricultural for ad valorem tax purposes. It pointed out that *896 the filing of a subdivision plat has very little to do with the present use of the property. It concluded that a statute which creates an irrebuttable presumption that the land was not being used for agricultural purposes solely on the basis of the recording of a platted subdivision was violative of the Equal Protection Clause.[12]
Consistent with the holding in Bass, we conclude that an agricultural classification for land cannot be denied solely because a plat containing it has been placed of record. Schultz relies on section 177.081(2), but if it has the effect he argues for, it also would be unconstitutional pursuant to Bass. Thus we affirm the trial court on the cross-appeal.
AFFIRMED in part; REVERSED in part.
GRIFFIN, C.J., and PETERSON, J., concur.
NOTES
[1] Final Judgment was entered against Sugarmill on June 5, 1996 and against Love on July 3, 1996.
[2] Herzog v. Herzog, 346 So.2d 56 (Fla.1977); Shaw v. Shaw, 334 So.2d 13 (Fla.1976).
[3] § 192.042; Bass v. General Development Corp., 374 So.2d 479 (Fla.1979).
[4] Art. VII, § 4(a), Fla. Const.
[5] McKinney v. Hunt, 251 So.2d 6 (Fla. 1st DCA 1971); St. Joe Paper Co. v. Adkinson, 400 So.2d 983 (Fla. 1st DCA 1981).
[6] §§ 163.3167(2), Fla. Stat. (1995); 163.3202, Fla. Stat. (1995).
[7] §§ 163.3164(23); 163.3201, Fla. Stat.
[8] State v. Smith, 584 So.2d 145, 146 (Fla. 2d DCA 1991).
[9] See also Bass v. General Dev. Corp., 374 So.2d 479 (Fla.1979); Roden v. K & K Land Management, Inc., 368 So.2d 588 (Fla.1978); Straughn v. Tuck, 354 So.2d 368 (Fla.1977); Conrad v. J.M. Sapp, 252 So.2d 225 (Fla.1971); Greenwood v. Oates, 251 So.2d 665 (Fla.1971); Wilkinson v. Kirby, 654 So.2d 194 (Fla. 2d DCA 1995); Ridgewood Phosphate Corp. v. Perkins, 487 So.2d 40 (Fla. 2d DCA 1986); Schooley v. Wetstone, 258 So.2d 483 (Fla. 2d DCA 1972).
[10] City of Miami v. Florida East Coast Ry. Co., 79 Fla. 539, 84 So. 726 (1920); Spencer v. Wiegert, 117 So.2d 221 (Fla. 2d DCA 1959); Feig v. Graves, 100 So.2d 192 (Fla. 2d DCA 1958).
[11] See also Wilkinson v. Kirby, 654 So.2d 194 (Fla. 2d DCA 1995).
[12] Art.1, § 2, Fla. Const.